I believe the next case is number 2011-1600 in RE DROGE. And I believe that the court has made two key legal errors in this case, one procedural and one substantive. As to procedure, the board erroneously placed on the applicants the burden to prove that one skilled in the art would expect a recombinational method to perform completely differently in a recombinational method to perform completely differently in a recombinational method. And I believe the court has made two key legal errors in this case, one procedural and one substantive. We read the board's opinion as saying that the applicants had not come forward with the evidence to prove that link, which indicated to me that the board expected us, the applicants, to prove that link. And then, to follow up on your question, there is in fact, in our view, no evidence of record that the board pointed to to prove that link. So that's the substantive error that I was going to next get into, and that is that the use of a eukaryotic cell using a mutant-formed integrase that had never been used for that purpose was obvious based on other studies that had used prokaryotic and in vitro experiments and had used different kinds of integrases. And the key fact that was missing from the analysis is evidence showing why someone skilled in the art would expect the success in the complex eukaryotic environment, a very much different environment than a prokaryotic cell. It has the nucleus, it has a more complex DNA, simply based on the other work in the other environments. And that's where the board, I think, made the procedural error in placing that burden on the applicants, and that's found, I think, at page 8 of its decision, page 9 of the appendix, where the board stated, referring, I think, the clearest application was where the board was speaking about the Lang-Gustafson reference, which is the one that was using an in vitro experiment and was using mutant integrases in vitro, and what the board said on page A9 of the appendix, page 8 of its opinion, as to Lang-Gustafson, appellants, again, have not provided any evidence that the ordinary artisan would expect the mutant enzyme to function completely different in the eukaryotic cell than in vitro. That's backwards, in our opinion. It wasn't... Okay, but if you read the board's opinion in its entirety, isn't it really more reflective of the fact that they accepted the fact that the examiner had cited to enough evidence to establish the prima facie case, and that what they were doing at that point was looking to see if there was any appropriate rebuttal? And that's the argument that the PTO makes in its brief on page 35. I think we think that's wrong for two reasons. First, if you look at the board's opinion, there's nothing in the opinion where it references the prima facie case or the fact that the examiner had made out the prima facie case. The second, I think, is more fundamental, and it confuses the two burdens here. There's a burden of production and a burden of persuasion, and I think that's being confused by the PTO here. This burden, the prima facie case, if it had, in fact, been made out, which we don't agree that it had been and don't see that the board found that it had, it doesn't matter. The burden of persuasion, what we would refer to as the burden of proof, colloquially, always rests on the examiner at all times to prove invalidity, including by proving that one skilled in the art would reasonably expect success in one environment based on demonstrated results in another environment. And the board clearly felt that that was an important concern because, at the part that we just mentioned, placed on the applicants the burden to disprove that link, rather than at any time placing the burden on the examiner to prove that the link exists. Yes, the examiner said there was a reasonable expectation of success, but what is missing is any evidence from which one might conclude that one skilled in the art would, in fact, extrapolate the results from those other environments into the more complex eukaryotic environment. So you're saying that even if we accept that Crescent teaches what the examiner thought it taught, that there's still not enough to put together Crescent with the... Yes, but I think... Let me take Crescent on its own. That reference doesn't contain anything that one skilled in the art could take as any kind of an indication about the activity of the non-mutant, the wild-type integrases in the eukaryotic environment. It has a broad claim, what we would view as an over-broad claim, to the use of many different integrases in many different host cells, but there's no experimental data here that would indicate to anyone skilled in the art that that, in fact, had even been accomplished, much less how it could be done. And I think there's one point... But that's the rebuttal, isn't it? I think that this business of going back and forth with the primifacia case is very interesting, but surely there is a burden on the applicant of coming forward either to argue, as I hear you argue now, that there was no primifacia case in the combination of Crescent and the prior drug publication, but rather than saying that they shifted the burden, there is a burden of coming forward with the document or evidence or whatever you have. If a primifacia case has been made out, and we can disagree with that, then the burden of production would shift, but the burden of proof, the burden of persuasion, always exists on the examiner at all times, including to prove this likelihood of success. And that's the error that we think was made here. And just to get at what Ford and the PTO are talking about with the Crusae reference, they're using a presumption that the patent would be enabled. We're not making an enablement argument here, and I think that presumption might work well in an anticipation rejection, which is where the law that they cite comes from. In anticipation rejections, you have one reference that contains all of the claims, and all the examiner needs to do is to point to that one reference and say, there it is, and that's anticipation. And because of the presumption of validity that attaches to patents, that patent is presumed valid, and therefore that's all the examiner needs to do. But in an obviousness rejection, there isn't any reference that contains all of the elements of the claim, and the inquiry is always what one skilled in the art would understand from the reference, not simply that there are claims in the reference. What one would understand and how it would be applied to another area. And people skilled in the art don't deal with presumptions. They deal with actual evidence, actual results, actual experimental results, none of which Crusae has in it. And in fact, I think that the PTO's brief, in our view, is telling on this point on page 23, the footnote in their brief. They actually say, well, presumably, if one's looking at Crusae, you have to do a number of different things to get to even using the non-mutant wild type integrases in a eukaryotic environment. You would have to have some way of getting the bacteriophage lambda integrates into the cell. You would have to have some way of adding to it an integration host factor, because the wild type only works with integration host factor. And they say, presumably, you would have to do that. The reason they say presumably is there's nothing in Crusae that explains how that could be done or even that it needs to be done. Yes, but the PTO allowed the patent, and by allowing the patent, we presume it is enabled, and you didn't offer any proof apart from Mr. Droge's, am I saying his name right, Droge? Yes. Mr. Droge's declaration in paragraph three, that's all there is to it. So it's not like there's this mountain of evidence to suggest one of skill in the art wouldn't know how to do this, even though it's disclosed in Crusae. You have Crusae disclosing wild int in eukaryotic cells, and you're right, it doesn't give working examples, but why don't we presume one of skill in the art would know how to do that, since it is an issued patent? And especially in light of the fact that you offered no evidence to the contrary, only attorney arguments. Well, we did offer the Droge declaration, and he explained in that declaration that it was one skilled in the art would understand that you needed to have, or thought at that time you would need to have additional cofactors to be used with the wild type. I don't see him arguing that in his paragraph three, which is the only substantive paragraph, Anything about one of skill in the art wouldn't know how to use wild int in a eukaryotic cell. It's not enabled, one of skill in the art wouldn't know how to do it. Right, he said at the time, this is page 900 of the appendix, he said at the time it was not clear whether the enzyme would be active in the absence of protein cofactors and negative DNA supercoiling. However, both factors are present in E. coli. And so he says that. Now this is not relevant to the Crusae reference, but what he's saying in that is that one skill in the art, based on their own work, by the way, the Christ and Droge publication, would have thought that you needed additional E. coli cofactors. Those are present in E. coli. Remember bacteriophage lambda comes from a bacteria. Yeah, but Lang and Gustafson disclosed the fact that this would work in the absence of IFH, IHF. IHF, yes, yes, but not any other cofactors. And they were working, of course, in vitro. By the way, they were using prokaryotic DNA in that case. They were not looking into a eukaryotic environment. No, but in Lang and Gustafson they expressly say in the absence of protein, which means, doesn't that, I mean I'm no expert in this field, but I thought that that meant eukaryotic. Is that not right? Well, they certainly said that the mutants work pretty well without IHF, but not very well. Doesn't that imply eukaryotic cell? I don't know this technology very well. No, it doesn't imply. They were working in vitro. They were working with a test tube environment. Eukaryotic cells can't be in vitro? No, the method of this patent is not in vitro. No, answer my question. Eukaryotic cells... Can't be tested in vitro? There may be tests that can be done. There's no evidence in this case that that's what was done in Lang and Gustafson. Lang and Gustafson said that this would work in the absence of the IHF protein. Right. So... And Lang and Gustafson, and the Kreis and Droge found that as well. The problem is that they also said that we don't know how this even works in the E. coli environment. We speculate, even though it doesn't need the IHF, that it might need other protein cofactors that come from E. coli, not that are present in eukaryotic cells. And nothing in the ART, nothing in Kruse, nothing in Lang and Gustafson, nothing in Kreis and Droge, the three publications that were relied on, gave one skilled in the ART the understanding that this would work in the new environment that they were using. Why didn't you offer a neutral declaration from somebody other than an interested party with respect to what one skilled in the ART would understand at the time? Well, I was not in the prosecution. I can't really speculate why we didn't do one thing or the other. We did offer the Droge declaration where he says, here's what one skilled in the ART, i.e. myself, understood. I don't think that the fact that he was the inventor should give that any less weight when one's looking at what skilled in the ART would understand. And again, I want to get back to what I think is the fundamental issue here, and that is the burden is on the examiner to prove that one skilled in the ART would necessarily have a reasonable expectation. And that's the key evidence that's missing here. Okay, so you've got two references, and between the two of them they disclose all the elements. The motivation to combine is the modified int has a greater affinity, which provides a clear advantage over using the wild int. So why isn't that enough? There's a motivation to combine. There's two references that disclose all the elements. Because there's no evidence that any of those environments would be reasonably expected to translate into the eukaryotic environment. And in that instance, there's nothing that one skilled in the ART would understand based on that. Well, but that's why they point to Lange-Gustafson, which expressly says this would work even – they believe it would work even in the absence of the IEHS. Even, but not in a – there's nothing – I don't even think they used the word eukaryotic in that entire reference. So there's nothing – Well, the PTO interpreted that, and that's a question of fact to which I have to defer, as suggesting that it would work in the eukaryotic environment. I'm no expert, and you introduced no affidavits that contradict that fact find. The fact of the matter is that there's no substantial evidence that would support that finding. And you can say – you can defer to it, but you can only defer to it if you can show exactly why it is that somebody – and we've pointed to cases in this court where it wasn't enough, where the experiments in vitro weren't enough. So we know as a fact that the simple matter that you have an experiment in vitro isn't enough. We have an experiment prokaryotic isn't enough. And the reason it's not enough is those are very different environments. So we have those cases from this court, which they don't, by the way, even address in their brief, that indicate that it's not enough. And what isn't missing is the extra factor, and that's what we understand that they want – required us to come forward with, we think the examiners should have. Let's hear from the solicitor. Thank you, Mr. Franklin. Ms. Kelly. Good morning, Your Honors. May it please the Court. The Drosch Declaration provides only two reasons for why the examiner allegedly did not make out a reasonable expectation of success in this prima facie case. One, that there is an absence of protein cofactors normally found in prokaryotes that do not exist in eukaryotes. And the other is that prokaryotes have negative supercoiling of the DNA and eukaryotes don't. The examiner showed why both of those reasons are just not sufficient to rebut the prima facie case that had been laid out before. What about your prima facie case, though? What hierarchy do you say actually bridges the gap here? Crusay explains that you can use wild-type int in eukaryotic cells, and wild-type int requires something that these mutants... Well, it says it. It says it. It doesn't really explain it. I mean, you have to concede there's no real explanation, and as your friend on the other side argues, enablement is important in the anticipation context, but there's a different analysis in the obviousness context. There is a different analysis in the obviousness context, but we're talking about a reasonable expectation of success. And if you look, it wasn't just Crusay that said, hey, you can use this wild-type int in eukaryotic cells. Hartley... We're not allowed to look at anything other than what the board relied upon, though. Well, the board adopted all of the examiner's findings, and the examiner made findings based upon Hartley. But the board made specific findings of obviousness based on specific prior art, and our case law says we are limited to the prior art that the board relied upon. But the board also expressly, effect finding number two, adopted all of the examiner's findings of fact, and the examiner also had cited the Hartley reference. But for other claims. Right, but the Hartley reference also says, which is an issue to attend, also says with great confidence that you can use wild-type int in eukaryotic cells. I refer your honors to page 863 of the record, and you'll see in column 8, line 12, it says hosts of any prokaryotic or eukaryotic organism that can be the recipient of recombinational cloning. The host, as the term is used here, it includes prokaryotic or eukaryotic organisms. And then it goes down, further down that same column, to describe the integrase, the wild-type land integrase system. So it's apparent that there's been a lot of work, a lot of study done in this very important field, but here we have one of the world's experts in this field, and he writes a very even-handed declaration, which he says pretty much, yes, there's been a lot going on, and we have been studying this, and we've been thinking about it. But what he also says is, until you do it, and find out whether it can be done or not, you don't know. Creuset didn't do it. He's got a catch-all that I would think any scientist in this field could have written in terms of the possible evolution of this field. The working with the eukaryotic is critical, I suppose, to the practical utility of this kind of treatment that would flow from the science that's here discussed. But what made an impression on me was the statement that until you show that it can be done, you don't know. And so the office says, well, it was obvious to do it and find out if it worked. I think that moves the standard a bit too far from as to what's obvious to try and what's not obvious to try. That's what I'm concerned about with this case. There's a lot of basic science here. I'm concerned that the board didn't use, abandoned the enablement argument that I know very well and just relied on obviousness. But for obviousness, that's where I'm having trouble with this board decision. How can it be obvious unless you really have indicators that this is what you should do and it will work? I have two, well, three things. One is I want to talk about the enablement rejection made by the examiner. Just to quickly state, that enablement rejection was based upon broader claims that encompass the use of any integrase mutant, not these particular ones that have been very well studied. In fact, the INTH mutant has been studied since 1980. So that enablement rejection was not based on the claims that are before this court. Now, in response to the reasonable expectation of success and whether you need to reduce this invention to practice, I have two answers. One factual, one doctrinal. I'm going to start with the factual one first. Droge gives only two reasons why you wouldn't expect this to work in a eukaryotic cell.  The first is, he said, well, there are these other cofactors that are found in prokaryotes that aren't found in eukaryotes. The prior art does not state anywhere, and Droge has not shown, that any of those other factors that may enhance wild type INTH function in a prokaryote are necessary for wild type INTH function. The only accessory protein that the prior art identifies as being absolutely required for wild type INTH function is IHS. Eukaryotes don't have that. So that's not a limiting factor for moving wild type INTH over into a eukaryotic system. Now, the second thing that he says is he talks about this DNA supercoiling. And I think it might be helpful here to explain what is meant by those terms. If you think of the DNA strand, the double helix is looking like the old-fashioned corded telephone that I think we've all grown up with. That's really very much what the DNA helix looks like. If you turn it to the right so that it coils up on itself, you have something that's supercoiled. And if you turn it to the left so that it coils up on itself in the other direction, you have something that's negatively supercoiled. When DNA is not actively being transcribed, it's normally supercoiled, and then there's some relaxation when it's being transcribed. But, as a general rule, the DNA in bacteria is more negatively supercoiled than that's on a eukaryote. Now, this is the second reason that Dr. Droge says, hey, you wouldn't expect this to work in a eukaryotic cell because of these differences between prokaryotic and eukaryotic cells. But Lane Gustafson tested supercoiled and non-supercoiled DNA and said, hey, in the absence of IHF, i.e., in the condition found in a eukaryotic cell, it doesn't matter. These mutant integrases work equally fine in either setting. So it's not enough to say, hey, we don't know if this would work in eukaryotic cells. Now I'm moving into the doctrinal reason. It's not enough to say, hey, we don't know if this wouldn't work in eukaryotic cells until you test it. So the PTO can't make out its obviousness case until it's tested. And if that was the case, then we'd never have obviousness. Everything would be a novelty rejection. They've said, here are the two reasons why we wouldn't expect what goes on in a prokaryote to work in the eukaryote. Or in our case, really, in a prokaryote and in vitro to work in vivo in a eukaryotic cell. And the examiner addressed both of those reasons and cited Lane Gustafson. And both of those reasons are, we submit, erroneous. And those factual findings were adopted by the board. And for both factual and doctrinal reasons, their argument failed. Do you have any other questions on that point? Well, there are a lot of questions for this case. I'm appreciating that the examiner abandoned the enablement argument after the prokaryotes were cancelled and therefore it's no longer before us. But the idea of, as you have just put it, of trying on the eukaryotic, of experimenting, of conducting experiments that had been set aside from everything that you look, if you look at the evolution of this science, it was generally believed that this is complicated. By the time we get to the eukaryotic, we have all of these additional complications. And we have the coiling and the uncoiling and the other things. And then, again, I am, I take note, I say I was impressed. These are maybe the most qualified scientists in the nation or in the world to understand all of this. They aren't just the person of ordinary skill who just take the next step and know or expect that it's going to work. And so when, again, I repeat, it would look to me like a very even-handed declaration of saying, well, we knew all of this. We understood all of this. And we expected and we hoped. But we didn't know until we actually did it whether it would work or how it would work. And they then proceeded over what looks from the record like many years of research. It wasn't something where you just say, you know, let me have that test tube and you pour it in and there it is. But this is not easy science. And the technology and the applications which they were evolving are incredibly complex. And where the office draws the line, it just looked to me, a good deal of thought needs to be given perhaps as to where the lines are drawn between the basic science and their applications. But to say that this was obvious seems to me to transcend what ought to be the rule for obviousness. Well, with all due respect to Dr. Droge, we're talking the use of bacteriophage lambda in the integrase system. This is one of the very first vector systems, if not the first vector system, to be used when molecular biology went off the ground in the 70s. This system was studied for at least 25 years by the time they filed their patent application. Exactly. And that's why the fact that the eukaryotic hadn't been used in the study because it was so much simpler and straightforward or whatever the reason is raises in my mind this question. I would disagree with that. People were modifying lambda to make, and I think in the record somewhere, there were over 400 lambda-based vectors at this time. It wasn't that many of which were being used in eukaryotes. It wasn't that it was too difficult to get to this point. There were so many alternatives that you could use. It was just a matter of getting around to this one. But they didn't do it. And that's what I think is interesting, that no one says that this was anticipated. They would say that it was obvious. Well, it cannot be the law that for a certain class of inventions, you absolutely have to reduce it to practice in order to show obviousness. This area is not that unpredictable. The argument is that this area might be very unpredictable, but I'm going to say it wrong. Bacteriophage lambda is sort of the most well-known and basic starting point for it. So while the area might be unpredictable, to the degree that there's more certainty, it would be the exact same as the issue here. Right. I think, yes, biotech is always called the unpredictable R, but some things, as time progresses, become more predictable. And we saw that in the Kubin case where something that Duhl had done was unpredictable, and this court found that was unpredictable and that it was merely obvious to try. And what we were talking about in that case, that the R was too unpredictable at that time. But then when we look at the Kubin case, we're looking almost exactly at what was done and proposed by Duhl, if we look at it broadly. And then in Kubin, we say, well, technology has progressed, and it has progressed to the point where this facet of biotechnology is no longer that unpredictable. What does the examiner have to do to satisfy the burden of establishing that there is a reasonable likelihood of success? In other words, you can't just assume that we take things that are done in totally different environments, and the examiners say, okay, because it was done here and it was done here, it would be obvious to put them together. I mean, obviously there's more than that. And our case law makes it clear that there's more than that. And your opponent is correct that in vitro and vivo are not always interchangeable. So what does the examiner have to do? What does the examiner have to point to in the R to show that there was a basis to integrate the two, to bridge the gap, as I said before? Right. I don't know that there's just one sort of test that can be applied to all situations. I think it's case by case. And in this case, the examiner said, look, the prokaryotic system is more stringent. It has more requirements. And if you're moving this to the eukaryote, you know, and those – sorry, the wild type integrase has more requirements than the mutant. And if we're talking about the mutant, those – they don't have those same sorts of requirements. So there's more of an expectation that the mutants would work in eukaryotes than the wild type working in eukaryotes. And here we have the prior art telling us that the wild type would work in eukaryotes or certainly works in vitro in the absence of IHF. So there's no reason why we would believe that these mutants that have fewer requirements would work well in this other sort of system. And when you look at the case law that they point to, the ENSO case, to say, well, this court has said you just cannot go from a prokaryotic to eukaryotic system and assume that it will work. When you look at the facts at the end of that case, the patentee – well, the patentee had claimed using antisense technology, which is very, very unpredictable. It still doesn't work to this day reliably. They had claims to methods of using antisense technology in prokaryotes and eukaryotes, but they had only shown that it worked in a few subspecies of E. coli. And there was, in the words of this court, ample evidence in the prior art to show that not only did antisense not work in eukaryotes, but it didn't even work in all species of E. coli or other prokaryotes. So that was a time when this court said, hey, you can't transfer prokaryote data to what would happen in eukaryote because there's evidence showing that it doesn't even work in prokaryotes. We don't have that here. We have scientific reasons why we would expect that this would work, that these mutants would work in a eukaryotic system. And we have scientific reasons to believe that the wild type would work in a eukaryotic system. Well, we at least have teachings in the prior art that state with confidence that it would work in a eukaryotic system, both of Hartley and those of Crusette. So the ENSO case doesn't help them. There is no ample – they haven't pointed to any ample evidence or any evidence where somebody said somebody tried to use this in a eukaryotic cell and it failed. And there was that sort of evidence in ENSO. Okay? Thank you, Ms. Jones. Thank you. Thank you, Rhona. Just a few points. The reason there's no evidence of anyone trying it in the eukaryotic system and failing is because these people were the first ever to try it in the eukaryotic system and demonstrate any results that might work from that. I think that to answer Judge Moore's point on the bacteriophage lambda, part of the bacteriophage means bacteria. It's a bacterial product. And it had been studied for many years in bacteria where it is native. It's a virus that infects bacteria. What these people were doing was taking it into a different environment, the eukaryotic environment. And that's important because it's a big advance in the art. If you can do this recombination inside a eukaryotic cell, you have the potential for gene therapy, which is the alteration of genes within an actual living eukaryotic being. And you have the potential to create pharmaceutical products that are more tailored towards actual human beings because they're created in eukaryotic cells. Now, just one point I want to correct in what my friend... But the Princeton-Droge article itself, on page 8773, says, hence int H-218, which is the modified int, exhibits an enhanced ability to execute recombination on wild-type ATT sites in the absence of accessory factors IHS and XIS. Right. Prokaryotic cells don't have an absence of IHS. They have IHS. Eukaryotic cells are the ones that have an absence of IHS. So the Christ and Droge article, the very person who we've discussed as being a world-renowned expert, suggests that with wild int, there is a surprisingly enhanced ability to recombinate in eukaryotic cells. No, not eukaryotic. I'm sorry. They were working in... Cells without IHS. Without IHS. What I would point the court to is... But that's eukaryotic cells don't have IHS, and prokaryotic cells do. The entire rest of this article is about prokaryotic cells. All of it is about prokaryotic cells. Except for that sentence, because that sentence, prokaryotic cells don't have an absence of IHS. Yeah, well, they had engineered what they had done is... Prokaryotic cells don't have an absence of IHS, correct? As a matter of fact. That is correct. Scientific fact. Yes, what I believe... Yes? Yes. Okay. What I believe they were doing, Your Honor, is that they had engineered prokaryotic cells so that they didn't produce IHS. They had made a mutant form of prokaryotic cell that didn't have IHS to test out the recombination. They did not work in eukaryotic cells. And what Christendroach does say also, and this is at page 775 of the appendix, and figure 7, and as well as 776, what they were speculating was that... They didn't know why it worked in prokaryotes, and what they speculated was that there were E. coli proteins, not IHS, but other E. coli proteins that might be necessary for the reaction to occur. And this is what, at page 775, they speculated a subsequent repair involving gap filling has to occur on the second strand by E. coli proteins. 775, figure 7, speculated on the role of E. coli proteins as one possible reaction pathway. 776, we think it is likely that E. coli enzymes degrade the linearized origin-bearing DNA. So what they were speculating in their own work was that they thought, at that time, that there might need to be E. coli proteins that help this mutant enzyme do its reaction. And that's what Dr. Droz repeated in his declaration. At the time we were doing this work, we didn't know it was going to work because we thought, as it turned out probably wrongly, we thought that there needed to be additional E. coli factors. And that's not surprising, given that bacteriophage lambda comes from E. coli, is a virus that is designed and has evolved to mutate E. coli DNA, prokaryotic DNA. It was not expected that one could necessarily take that and transfer it into the eukaryotic environment. And I think what my friend was talking about with regard to this court's cases, what those cases show is that there isn't a necessary connection. Just by saying it's been done in prokaryotic doesn't mean you can do it in eukaryotic. And maybe this antisense is or isn't more predictable, but wasn't shown in this case. And the examiner had the burden to show it in this case. This is not a court case where somebody's coming in and has the burden to overcome the examiner. The burden is on the examiner to show that one skill in the art would, in fact, predict success in one environment based on success in the other. I would like to do one correction, if I might. I know Hartley is not really before the court, and I agree with Your Honor on that. But we have explained that Hartley did not involve the use of these integrases in a eukaryotic cell. When she's referring to the host receiving a product, what that means is that the host can receive a recombination product that's already been created somewhere else. There's nothing in Hartley, and it's in our briefs, and I don't want to repeat what we said in our briefs, but there's nothing in Hartley where that inventor worked with recombination inside a eukaryotic cell. Are there any questions? Thank you, Ms. Franklin. Thank you, Ms. Kelly. Case is taken into submission.